08-0645 People v. Cesar Munoz Good morning Your Honor. Kathleen Zellner on behalf of the appellant Cesar Munoz. Good morning Your Honor. Matthew Connors on behalf of the people of the state of Illinois. I have one preliminary question. Why do we have two blue briefs in this case? One purporting to be a... They bear the same labels, but one has a statement of facts in it and the other doesn't. The people filed three briefs in this case, Your Honor. The first two were not allowed to the clerk of the appellate court So the people filed the third and final brief without a statement of facts. But they both appear to be under the clock. Is there a reason for that? Ordinarily if one is filed, the other two don't bear any indicia of having been filed. It was our understanding, we were informed by the clerk of the court that the other two had not been filed and it was for that reason that we did file the brief. So it's simply an anomaly. That's correct. I did not mention, but you probably both know, 15 minutes for each side. And you may save out from your 15 minutes any portion you wish for a response. Thank you, Your Honor. May it please the court, counsel, this case, I'm sure the court is aware, has now gone through a third trial. First trial we had a hung jury. Second trial went up and was reversed on two grounds. It was reversed on the testimony of the forensic pathologist for the state who agreed that she held her opinion, agreed with the question from the prosecutor that she held her opinion beyond a reasonable doubt. This court reversed on that, said she had invaded the province of the jury. It was reversed on a second ground and that was that the trial judge had kept out on a motion in limine the affidavit of Elizabeth Constable stating and commenting upon the mental state of the decedent. And this court found under the controlling case law that that affidavit should have come into evidence notwithstanding the old Supreme Court opinion in Siebert which did not seem to favor a state of mind testimony of regarding suicidal predispositions unless accompanied by a contemporaneous act. Yes, and that's one distinction the court made in saying that Siebert was not controlling. So that statement of Constable's was that conversation took place a week before the decedent's death. I want to just try to narrow in on what I think are the issues that would cause this case to be reversed again. The pivotal issue in the case is was this a murder or was this a suicide? And in the opinion of this court after the second trial, the court said we believe that the evidence from the second trial shows the case is closely balanced. We had a hung jury the first time and we got a series of facts. We don't have an eyewitness. Now, you know we're not necessarily bound under law the case factor into our own decisions or our own conclusions plus the fact that the evidence being closely balanced in the first trial doesn't necessarily measure how closely the evidence is balanced in the second trial. I totally agree with the court that that would not be definitive or controlling. Some of the key evidence, though, has not changed, and that is that there were no eyewitnesses, no prints on the gun. Very significantly, there is only gun residue on the decedent's hand, left hand. There is an inconclusive finding about the defendant and whether he had gun residue on either his right or left hand, and significantly, gun residue is comprised of barium, lead, and antimony. He does not have antimony on his left hand. The state expert Burke stated that he could not even say that what was on the defendant's hands was gun residue. However, he testified that it is possible to erase the gunpowder residue through various kinds of movements or activities, including the activity of being handcuffed in the vehicle, testimony which was first given by a policeman to which you objected, by two policemen, including Detective Rutherford, on the basis that they were not experts in the area. However, that testimony was ultimately cumulative to the testimony of Burks, who is not being challenged on the basis of his lack of expertise, so that, at most, that evidence is neutralized. But it does not prove or tend to prove one way or another whether, in fact, the gun was first held by the defendant. Well, I would just slightly disagree with the court two things. One is Do you dare to disagree with the court? Slightly. Only slightly? Right. I do think Well, I'm all you've got since I wrote the first conversation. I'm well aware of that. You've got to be careful. Yes. I may do your best shot. The difference, Your Honor, in the third trial is that Rutherford, and I agree that Rivera's testimony is probably pretty neutral and not much different from Burke. Rutherford's testimony is different from Burke. I'm talking only about the GSCR testimony. No, I'm not. I'm not talking about his rejection of the defendant's interview, assertions during his interview. No, I am too, Your Honor. I'm careful to label it interviews rather than testimony. Yes. And since there was no statement by Rutherford regarding the credibility of his in-court testimony, at least not directly. Right. But the point I was trying to make is Rutherford in his third trial, unlike the first trial, unlike the second trial, offers an opinion that he believes that it would make it, because the defendant's handcuff behind his back in the squad car and the gun residue could have been wiped off, he specifically says that he thinks it is a remote possibility, a remote possibility there would be any gun residue. That's different. Okay, let's get to, I follow you. Okay. But I don't think we're at issue because it's all that I, I didn't even assert it, I act as devil's advocate, all that I'm proposing is that at best it's neutral. It doesn't tip the scale one way or the other. But on the other side of that ledger, you have the fact that the defendant himself, although he didn't admit to knowledge or jealousy regarding the adulterous relationship of his wife to the friend of Flores, who was also living in the same household, but he did admit some jealousy about her getting a job. The entry of the bullet wound, as testified to by Dr. Jones, was that it was on the underside of her chin, indicating soft contact rather than hard contact, which is more typical of a suicide where they are not going to keep any space between the weapon and whatever part of their body they choose to, as the point of entry for their gunshot. Then he drags her body off the bed onto an adjacent room. Then he drops the gun outside of the window into a wastebasket, which you rightly point out has been indicated in one particular case as not dispositive of the issue of guilt because it could also be indicative of panic that could accompany a suicide. But it's not a factor to be totally ignored. And then he has three different versions of the incident, which he gives to Rutherford. Without regard to what Rutherford's comments are, he did change his story three times and then revert to a fourth story while he was in court. So you have all of these indications of guilt. Now, do you still want, do you still think that I am compelled to necessarily assume that the evidence is closely balanced here, even though it might have been, that assertion may well have been made, in fact was made, in the earlier Munoz's opinion? I do. I respectfully submit to the court the evidence you just described was the evidence in the first trial. With the exception of Nancy Jones' testimony that she could say beyond a reasonable doubt that this was a homicide. Well, that's changed. That was a hung jury. That was changed. She no longer said beyond a reasonable doubt, which echoes the legal status of, it's a legal construct rather than a medical construct. But she didn't use those words. She said beyond a reasonable medical certainty. And the issue that you posture is whether there is enough of an echo in that assertion to rejuvenate the earlier error in her testimony that it was beyond a reasonable doubt. Is she, in fact, staying within the confines of expert testimony of a non-legal expert, of a medical expert, or a forensic expert, as opposed to the court, which is the only expert who can give instructions on the law. And that's where you are, aren't you? That's correct. And our assertion in the brief is that it is a distinction without a difference, because medical experts, and I know from doing a lot of civil medical malpractice, are not allowed to testify beyond a reasonable degree of medical certainty. So if you transfer that. What do you base that on? Because I chased your cases on that score. And what I found in those cases was that it's sufficient if they say that their testimony is limited to be within reasonable medical certainty or reasonable engineering certainty. But where do you have cases that say that they can't say it's within reasonable certainty? It's certain. I have never. It's categorically or absolutely certain within the discipline of my expertise. I've never seen a case that held that. And I'll tell you that you didn't hear it. But you didn't show me a case that said that to be certain categorically, as opposed to be reasonably certain within the confines of the discipline, that that's permitted. Here's the inherent unfairness of that, all right? Here's the inherent unfairness. Dr. Teese, who's testified many times, as has Dr. Jones, both know that medical experts testify to a reasonable degree of medical certainty. But never beyond. Never beyond. And Dr. Teese comes in, and she's put at a disadvantage, because she's coming in testifying by the book to a reasonable degree of medical certainty. And you have Dr. Jones testifying beyond. The question is, is her statement that it's beyond reasonable medical certainty, a statement of law rather than a statement of a lay statement within the secular, non-legal context to which her testimony must be limited? There is no such thing as being able to testify beyond a reasonable degree of medical certainty. And it's a very adroit, clever, transparent move on the part of the state's attorney to circumvent, because it is a closely balanced case, to circumvent this court's ruling that she should not be testifying beyond a reasonable doubt. If you have testimony beyond reasonable medical certainty, where is the doubt? Where is the doubt in a case where the pivotal issue is an emergency suicide? I don't mind agreeing with you that it's pushing the envelope. And I'm not going to postulate the state's defense to that accusation. I'll let them do it themselves. Even though it's not the first point, it does not in its context appear to have been plotted out that way, but rather spontaneously postulated, formulated in that manner by the witness on a third or fourth or fifth bounce. Well, actually, what she does testify to specifically after counsel has asked her, just like he did in the second trial, is your testimony to a reasonable degree of medical certainty? She says yes twice. Then on her own volition, she says, in looking at all of the evidence, police reports, photographs, looking at the affidavits, I am convinced beyond a reasonable degree of medical certainty this is a homicide. End of case. If you allow that type of testimony, that's the end of the case. There's no reasonable doubt. There can't possibly be any reasonable doubt. And here's Dr. Teese testifying to a reasonable degree of medical certainty. And Dr. Jones admitted this case, the forensic findings in this case are consistent with the suicide and the angle of this bullet, which is straight up and through the vertex of the scalp at seven and a half inches above where the woman is shot through the lip, is definitely consistent with a self-inflicted shot and she's the only person with gun residue on her hands. I mean, that could not be more clear. And it is consistent with the suicide. So I think the idea that this is anything other than a closely balanced case, there is no new evidence here except these things that are not proper that should result in a reversal. And first and foremost is Dr. Jones who also testified despite this court saying that it thought that at the day it could come in on the decedent's suicidal disposition, she said she never considered her mental state. She didn't need to consider her mental state because she knew beyond reasonable, there's no doctor in the world that knows anything beyond a reasonable degree of medical certainty. So I just don't think that that is, I mean, I think that is a dangerous precedent to set, to let a doctor circumvent the reasonable doubt standard. But to reverse this case on that ground moves the frontier from where it already is and which is already reflected in the earlier Munoz case where she actually used the legal characterization of being beyond reasonable doubt, echoing the instruction that the jury receives from the court. So it moves the frontier, doesn't it? Well, it does, but I think it raises the question, should we punish the state for pushing the envelope? Should we punish the defendant? Should we punish the defendant when we know when she testified properly in the first trial there was a hung jury? In the first trial, when she testified to a reasonable degree of medical certainty, there was a hung jury. When she testifies improperly, then there's a verdict against the defendant. So I think that matters. The only other point I'd raise quickly because I want to reserve if I can make five minutes. Go ahead. I was going to suggest that you start winding down. Yes. Just one other point, and that's the closing argument of the prosecutor and very specifically on the point of the prosecutor telling the jury that he believed that the defendant should have brought in the witnesses who had given the affidavits. And I think that's an improper shifting of verdicts. I'm going to take you on on that one, too, because I really want to test to see what this is. When we have the expert using the affidavit, it's a 703, 704 Wilson versus Clark type of situation. The expert can give his opinion and rely on any evidence or any, I shouldn't say evidence, any data, whether it's admissible as evidence or not, that flies in that particular discipline that is considered appropriate for experts to rely on, which could be hearsay and whatnot. However, the basis of that opinion is fully exposable by either side and most importantly by the cross-examiner. And he can or she can attempt to impeach the expert's testimony based upon the reliability of the underlying data. And in criticizing the underlying data, is it not appropriate for the cross-examiner to point out that the underlying data consists of lay affidavits that are not, were not susceptible to cross-examination and therefore lose some degree of their reliability. Now, should we characterize that as shifting the burden of proof or is that within the confines, the discretionary confines of the cross-examiner to attempt to impeach the basis of the expert's testimony? Let me be real specific. I'm referring to two statements. The prosecutor says now an expert like Dr. Tease can use them, the affidavits in her evaluation, and that is a backdoor way of getting that in to you. There's nothing improper about her having relied upon it. The second thing is... It's always, the game is always backdoor, isn't it? That's the game that the attorneys are imposed upon to play in any trial, to see if evidence which is not admissible through the front door can be admissible through the back door with us sitting up here to make sure that to the extent there could be some damage control, that the damage be controlled. The second thing, we didn't get a chance to cross-examine them. They did not bring them in. That's not the defendant's problem. The State could have brought these people in and they didn't.  Except for the fact that it simply points to the use of what is less than fully reliable data by the expert. Data consisting of affidavits rather than first-hand contact with the witness. Right, and that is the law and that's fair game for the defendant to do it. And the jury shouldn't be being told that that isn't proper. That's my point. Thank you. You'll be given an opportunity to respond after the State has an opportunity to present their case. Good morning again, Mr. Connors. How are you? Good morning. May it please the Court. The first contention seems to be focused on… Let me ask you a hypothetical question. Let's suppose that you're the State's attorney and you want to show the jury that the defendant is jealous. Okay. How are you going to go about doing that? Well, in this case, we have multiple facts which did establish the fact that… Multiple facts? Yes, we have. What facts are those? I'm very curious. So am I. That's why I asked the question. We do have the testimony from the victim. What did you put in evidence in this case, though, with respect to his jealousy? And how did you put it in? The first reference to the jealousy embraced by the defendant was the victim's testimony to… The victim didn't testify. She was dead. She was dead. The victim made a statement… The victim made a statement to a third party… That's fair. That's what I understand. …who came in and said the victim told me that her husband was jealous of her. That is correct. Jealousy is a… I'm sorry. Do you want to take… I just wanted him to tell me how… I was going to give him a hypothetical, but you know that the motive for this particular murder is jealousy, and you've got to get it in before the jury. How are you going to do it? Initially, there was the statement from the victim. So you put Munoz out. No, you don't put Munoz out because he's the defendant. You can't do that. But we do have the… You do have a witness who said he heard from the victim that the defendant was jealous. That is correct. If that's the only hearsay, that's double hearsay, isn't it? If that statement were directed to establish that the husband was jealous, then it's clearly not admissible. It's double hearsay. If it's admitted for the truth of its content, In other words, that the debt declarant, the out-of-court declarant, when she said her husband was jealous of her, that she was telling the truth, she's not there for cross-examination. Consequently, it's not admissible for that purpose. So you say, well, it's admissible to show the victim's state of mind. What is the state of mind? You know, this raises specters of the old Hillman case, which basically threatened to tear down the walls of the entire fabric of hearsay testimony because any statement is also reflective of a state of mind. So there are certain prerequisites for that statement, the prime one being relevancy. Okay, now here you have a statement by the victim which shows she's under the state of mind that her husband is jealous. So what? What's its relevance? It is relevant to explain why the victim behaved in the manner she did. Negate the defendant's theory of the case that the victim was suffering from depression and that at that point in time that she was jealous of him. Are you helping the victim establish a suicidal tendency? Is that the purpose of that evidence? By showing her her husband is guilty, are you now saying it was there to assist the defendant in establishing a suicidal state of mind? No, to negate the defendant's assertion that the victim embraced a suicidal state of mind. Here we have an instance where the defendant was indicating he was jealous of the victim. Now, this isn't a case where the victim indicated that she was unhappy. The defendant is not indicating that he was jealous of the victim's affair. You're trying to introduce that through the so-called state of mind evidence. No, the language which is used only with relation to the terms of the victim's statement did not refer to the affair at all. There was not an assertion raised by the victim that the defendant was jealous of the affair. The only reference to jealousy stemmed from her going out that morning and attempting to get a job. Now, the reference to the affair... Her statement was that the husband was jealous of Flores. There was a statement to the police where the defendant... Yeah, and that's the testimony that came in, so to speak, to show a so-called state of mind. No, that was the statement to the detective where he indicated... But that's what he testified to. How did that get into evidence? On what basis was the detective permitted to testify that the victim told him that she thought her husband was jealous of her affair? The detective did not testify that the victim told him that. The detective was referring to a conversation he had with defendant wherein defendant admitted his jealousy. No, no. The defendant's jealousy was for getting the job at the Luna. It was not jealousy of Flores. There is absolutely no evidence that I could find that the husband was even aware of the adulterous relationship. People have previously stated, just minutes ago, that this was referred to as the defendant being jealous of the victim's attempt to get a job. I have not made an assertion to this court at this point in time. But that's not what the detective testified. The detective testified to jealousy of her affair. The detective testified the defendant was jealous. Because jealousy of her getting the job does not establish a motive to shoot her. Obviously the people... Jealousy of having an affair does establish that motive. That's why that bit of testimony is so critical. And that's why we're pausing on it to the extent we are. Because it's pivotal evidence in this case. It was also the first evidence that was introduced to the jury, wasn't it? Mr. Flores testified first. That is correct. So you had an opening argument by the prosecution as to, we think the evidence will show, and so forth and so on. And then you have the defense coming in and saying, we think the evidence will show that this was clearly a suicide and not a murder. And then you trot out Mr. Flores. And Mr. Flores is directly examined by the state's attorney. And Mr. Flores testifies to, allegedly, the state of mind of the victim, who's dead. And the two things he said that the state considered germane to their case, presumably because they were anticipating a suicide defense, they were going to rebut this by pointing out that she told Flores that her husband was jealous of her. And that's the only injection in the record of any jealousy about the affair. But then he trots out something else. He says, in addition to that, she told me that she was afraid of guns and didn't want them in the house. Yes. Now, presumably this should be tied in with the fact that somebody who commits suicide with a gun would never do it if they were frightened of guns. That would be the logical inference. Okay. And my response to that is, again, that's, again, her state of mind. Right? Yes. That's how it comes in, because she's dead. The only way you can get it in is through some exception to the hearsay rule. Yes. And there are, as we all know, too many exceptions to the hearsay rule. Despite what Justice Gordon occasionally says, and despite Wilson v. Clark, and despite federal rule, here is the state really, it seems to me, pushing the envelope. Because now the jury has heard two things, and that's all the evidence that they've ever got, out of the mouth of Flores, through the mouth of the victim. The federal rules say that there is total exception. Oh, I know, I know. But we're not in the federal court. Fortunately for the defendant. My suggestion to you is that it seems to me that you've got to come up with something better than just the argument of state of mind to argue that this was an exception. You might be better off saying that it's harmless beyond a reasonable doubt. Well, that's going to be the big question. Once we establish the fact that there is absolutely no admissible testimony to establish that there was an affair with Flores and that it gave rise to any jealousy by the defendant. Unless you want to tell us that since we know that they were living in the same household, since we know that he was accompanying her and there might have been independent evidence of the affair, that might have been okay. That we should simply assume that because that situation existed, there was jealousy. But the fact that there was jealousy was not introduced into evidence, except through the so-called state-of-mind door. And this state-of-mind door, with all due deference, is really trumped up because it does not hold to its admissibility, because it's not relevant as state-of-mind evidence. It doesn't do anything to move the case to know that she was of the state of mind that her husband was jealous of her affair. The only efficacy of that testimony is as a device to advise the jury of the fact that he was jealous, which under the Wilson v. Clark aegis cannot be the case. There are a number of points that I would like to address. I hope you address one, that one of them is the point that I'm trying to make. Initially, there is independent references to the affair, not just from John Flores. We also have the admission during rebuttal evidence. But there's no evidence of jealousy. And my question to you first was, do you think it's enough if there's an affair, that there need not be any evidence of jealousy, that we can simply infer that almost as a matter of judicial notice? In order for this court to reach a determination that the homicide took place in that manner, it would have to assume that the victim was solely killed based upon the fact that she was having an affair. We don't know that that was the case. Throughout this case, we established that on the date in question, the victim left. She went for a job interview with somebody she was romantically involved with. We cannot establish, and we're not required to establish, what provoked the defendant to do it. Exactly. You're not required to establish that, but that certainly puts your case at a tremendous disadvantage, considering that the evidence is what it is and has been characterized, at least by yours truly, as being closely balanced to start with. So you have here a set of facts pitting the gunshot residue on her hand against the inconclusive state of any gunshot residue on the defendant's hand, and whatever other factors there are to try to determine, was this a killing or was this suicide? And now you're saying we don't need motive. But the fact of the matter is that you have motive. So I take your statement as meaning that whether there is or isn't motive is not prejudicial. It's harmless error. Is that what you're saying? Because since you don't need a motive, giving a motive is harmless error? Is that how that's determined? The harmless error would only occur if, in fact, there was an error in the admission of this evidence. Munoz 1 laid forth a three-pronged test which necessitated, in that case, the admission of state-of-mind evidence because the defense had prepared these affidavits. And in those affidavits, it indicated that the victim had articulated some sort of suicide ideation. Now, the people and the defense both knew that the victim's mental state would be key here. What is the mental state that you're attempting to reflect by her assertion of a mental state constituting a state of awareness or presumed, well, of her having you can't say it's an awareness because there's no fact established. So you have to say the mental state being an impression by this victim that her husband is jealous of her. That's all we have. What conclusion is driven by that state of mind? The evidence is necessary because the defendant has chosen to interject the notion of suicide into this case. Suicide connotates- Well, the best evidence you had against suicide was the evidence that nobody disputed, was that the gun wasn't in the room after she allegedly killed herself. It was found in a trash can under a bag outside the apartment. There's a plethora of evidence. Now, there is very few suicides where the victim of the suicide disposes of the gun. In this case, it would have been impossible. And, you know, why you didn't put on that evidence first is beyond me. But, of course, I'm not trying to try your case for you. Instead, you trot out this- Except that there is a Supreme Court case that does say that you can dispose of the gun and still not reflect culpability because you can do it in a state of panic. And that same case also says that the suicider herself can sometimes dispose of the gun. If they live long enough. We know in this case that that could not have happened. And we also know in this case that the evidence simply wasn't the fact that the gun was recovered someplace else. We have the fact that the defendant dragged the 5'3", 137-pound victim from the bedroom through the apartment, head down with blood gushing from her head, keeping it away from himself. He dragged the victim through the apartment. We have a plethora of other evidence. That's all good evidence. So my trot-out floor is with all this nonsense about jealousy and the state-of-mind evidence of the victim. Because, again, defendants' entire theory of the case required the jury to believe that the victim was suffering from some sort of suicidal ideation. Does the fact that she thinks that her husband is jealous of her contradict or negate the fact that she may also be depressed or in fear or whatever it is, whatever motivation there is that drives people to suicide? Is that inconsistent? It does detract from the notion that- Oh, she can't have more than one thought in her mind at a time? She very clearly can, but it doesn't seek to validate that point. The people have- You mean that it's relevant enough to overcome the high degree of prejudice of eat that that testimony will engender in establishing jealousy as being in fact a motive when in fact that statement does nothing to establish or should do nothing to establish the fact that there was jealousy? In the face of that kind of heat, is there enough light to overcome it simply by saying that she now- We should be able to show that she was aware of her husband is jealous because it negates the thought of suicide. To what extent does it negate it? One percentage, five percentages, one-tenth of one percent, as opposed to the prejudicial impact of this evidence? If it comes down to a relative measure of the prejudice or probative effect of the evidence, then we look at the determination of the circuit court and determine whether or not the circuit court erred in the admission of that. And this court pays due deference and determines whether or not the circuit court- It's not when there's outright error. I mean, we talk about the admissibility of evidence being discretionary, but there still is a line to be drawn between being correct and being in errors. And in Munoz 1, this court laid forth that test and indicated that where it was clearly as a matter of law, it would apply to NOVA review, but in an instance where the circuit court weighed and engaged in an analysis of the evidence- Well, I think you've milked whatever you can in your defense on that point, so I'll let you go on. Next, I'd like to turn to the comments regarding- You need to be thinking about the clock a little bit, too. Defense counsel opined that, alternatively, Dr. Jones or the people deathly attempted to overly persuade the jury of the beyond a reasonable degree of medical and scientific certainty. You have any idea what that means? Other than maybe a state's attorney being too clever by half by suggesting that he read Munoz 2 and said, We'll get around that. Don't testify to beyond a reasonable doubt. Just testify to beyond a reasonable degree of medical certainty. It really does echo, doesn't it? Interesting. That was a point made by counsel for the defendant. Yes, but the only similarity is the word beyond. So the question is whether the word beyond is a talisman or a principle. No, no, there's two words. It's beyond reasonable. And then it's a question of doubt versus medical certainty. That's the only difference. In one case, it's doubt. In the other, it's medical certainty. But it certainly, in the eyes of a jury, may very well be considered to be a reflection of the beyond reasonable doubt standard that the judge instructed. If I may, the language that was utilized here, which would not be in error, which was utilized on four other occasions, was to a reasonable degree. So the word reasonable degree will always be the standard that is applied. It was, at best, a foolish risk for the state to take, in light of the fact that the earlier case was reversed because of the use of the term reasonable doubt. Now to say reasonable medical certainty is certainly walking in to the outer flames of the fire. This Court's opinion specifically held that because the doctor was allowed to testify, that her opinion on the ultimate issue of the case, whether the manner of death was homicide, was beyond a reasonable doubt, and that the jury would look to that testimony in addressing the term reasonable doubt later in the case. Of course, if you say that to us, if somebody says, this is clear, it's beyond proof, we say, show me your case. But that's not what it says to a jury. However, what this Court made clear. But it reflects an attempt by the witness to cover for the lack of basic supporting data by making this huge assertion that it's beyond medical certainty. Do you think you could get away with this, for example, in a standard medical malpractice case where the doctor testified normally to a reasonable degree of medical certainty, that there was negligence in this case, if he testified beyond a reasonable degree of medical certainty? Do you think you could get away with that in a high-profile, many dollars involved civil case? As a non-civil participant, I would be unwilling to venture an opinion. I think you'd find the defense attorney jumping up and down and taking off his clothes the moment the word beyond came out of the mouth of the witness. But the word beyond has no talismanic principle. No, but it certainly has an impact on a jury. Yes. And that's the whole point of the defendant in this case. Yes. But in this case, we have the prosecutor informing the jury, reasonable degree of scientific certainty, four times. The only time where the jury. That didn't help you in the earlier case where that was done, too. Once the fatal words beyond a reasonable doubt emanated from the witness, you couldn't cover for it. Correct. And the people's assertion has always been in this case that the term beyond a reasonable doubt is a term of art utilized by attorneys every day. It's something that even. Oh, yeah, no closing argument and opening argument and everything else, but you don't let witnesses say it. And that's not what occurred here. And because jurors looked to the expert witness, and they heard the term reasonable doubt, and they heard that in the context of a cause and manner of death, this court concluded, well, we heard that term. We might inadvertently apply it here. In the case so far, there are two sentences where one was on redirect and one was on direct where the witness testified, the evidence convinced me beyond a reasonable degree of medical and scientific certainty of my conclusion. If nothing else, if it weren't so, in such jeopardy under case law because it brings back reverberations and mimics an instruction on the law, it would otherwise strike me as being very amateurish. For an expert to use the term beyond reasonable medical certainty is an amateurish rather than professional evaluation. For the witness to volunteer this, and it must be clear from the record that the witness volunteered this response. It was not precipitated by a question by the state. For this court to determine that the use of the word beyond an involuntary I'm not here to criticize the professionalism of the witness, but to point out that it goes outside of the discipline to use that kind of phraseology so that it means instead of testifying within the discipline of her expertise, she is dragging in other value systems, which the closest being the value system of the juridical analysis. Do you want to sum up? Briefly, I'd like to touch upon the fact that there was an allegation raised versus the propriety of arguments and closing argument. And in this case, a defendant focused primarily upon the prosecutor referencing the discrepancy in the use of live testimony versus an affidavit. Munoz 1 was replete with references as to the differences between the two cases. We do have the defense attorney substantively using, and Dr. Teese even goes so far as intermittently declaring that the victim suffered from postpartum depression or bulimia based upon her belief that these affidavits were substantively admissible, and then whether or not she believed the truth of the matter asserted therein. So thus, the prosecutor did not indicate to the jury, defendant has to bring somebody in here to tell you about this. Instead, the prosecutor, and even on the record, it bears out the fact that the prosecutor explained, I was holding those documents, and when I held those documents, I was demonstrating to the jury that this is what Dr. Teese relied upon, not live testimony, not the testimony that you had heard from all the other witnesses. Except the phraseology was phraseology that could very easily pass as an attempt to shift burden of proof. Because the statement was, they could have brought in the live testimony as opposed to saying that these witnesses were not available for cross examination. Which, had they used the passive case in introducing that notion, it would have been relatively free of any contamination. But saying that the defense could have brought them in, that raises at least ghosts of shifting the burden of proof. The prosecutor did make that argument. And in fact, on page 942 of the record, the prosecutor specifically reminded the jury that the defendant did not have the obligation to bring forth evidence. And in fact, specifically told the jurors that they could rely upon. Yeah, but you can't necessarily play that game successfully by first violating the rule and then saying, I don't want to violate the rule. You know, you're taking your risks when you're doing that. And along the line, too, when the prosecutor basically defaced this witness by calling her a charlatan, you're going to say, he didn't call her a charlatan. No, he didn't. He said, she's worse than a charlatan. Now, if you don't want to say that that's calling her a charlatan, fine. Then it's calling her something worse than a charlatan. And that kind of invective is not proper. The people's response to that question, to that remark, was the fact that Dr. Thies was confirmed as an expert in the field of forensic pathology. That is where her expertise ended. However, in 118 pages of cross-examination, we have Dr. Chakoutis based upon two affidavits and investigative report, alternatively diagnosing and then backing off of three different psychiatric conditions, wherein she indicated she wasn't aware of even how to diagnose those conditions. So we do have a position where somebody is operating outside of the realm of their expertise, outside of the realm of how they should have been testifying. And to tell the prosecutor that they cannot stress the impropriety of somebody who's testifying outside of the range of their medical and scientific basis would really divest the people of the ability to challenge any sort of the credibility or the underlying steps. Well, the fact of the matter is no one challenged your qualification. No, she's licensed. So if she's qualified to testify, then the remarks cannot be intemperate. They can't. That's just not the remarks were beyond what is the appropriate kinds of critiques that one expert could give to another. I understand my time is short, but I just need to stress the fact that Dr. Teese was recognized as an expert solely in the basis of forensic pathology. Merely because an expert is recognized in the field of one area does not allow them to testify into expert matters. But you didn't challenge her qualification. You simply smeared that witness after you let her testify without objection. No, the people conceded that she was properly testifying as a forensic pathologist. Well, you didn't object to her opinion testimony. The people did specifically object when she attempted to diagnose the victim with postpartum depression and believe it. That was not even an issue, the postpartum depression. That was simply another witness had brought that up, and that was, well, I suppose it was an issue, but not in any primary manner. It was a significant basis upon which Dr. Teese opined that the victim committed suicide. She specifically indicated that the victim was suffering from postpartum depression because the birth of the child occurred within nine months of the death of the decedent. That was the conclusion she drew upon to reach her conclusion of suicide. So this court cannot take away from Dr. Teese's opinion the fact that she relied upon evidence which was inconsistent and outside of her range of expertise. I'm out of time, so if there are no further questions. Thank you, Mr. Connors. Ms. Zellner, a final brief word. Just a couple of points on Dr. Teese. I know the Illinois Supreme Court in People v. Moss said that comments denigrating the defendant's expert witness must be strongly condemned. And in that case, they specifically referenced an attorney referring to an expert witness getting money for their testimony and their testimony being dishonest. And there's actually a statement exactly like that at the closing. There's nothing wrong with what she said per se, but if you're going to do it. They're talking about her getting money. She saw an opportunity, she jumped on it, she's been jumping on it for 16 years. There's nothing wrong with this per se, but if you're going to do it, do it honestly. So I think that it's pretty clear. And then a report was called junk in the closing. But I want to just go back very briefly on this jealousy thing. I thought since we had students here, there is an opinion by Justice Cardozo in People v. Shepard which was within the cases the court used in the second opinion. It's called the Dr. Shepard case. Dr. Shepard poisoned me. The wife told her nurse that a few minutes before she died. Dr. Shepard contended the wife had killed herself. Justice Cardozo commented on that and said that it is acceptable in a suicide case to put in evidence of a persistence of a will to live. And the defendant would have no grievance if that had been the testimony. What the government put in evidence here, however, was something very different. It did not use the declarations by Mrs. Shepard to prove her present thoughts or feelings or thoughts and feelings in the past. It used the declarations as proof of an act committed by someone else as evidence that she was dying of poison given by her husband. This fact, if it is a fact, the government was free to prove, but not by hearsay declarations. Thank you. I've always, bear with me for one moment. The use of Cardozo was really an interesting point. I've always proposed, however, that the State's Attorney's Office bring in the trial counsel in the case so that the heat can go directly to trial counsel rather than to these very competent appellate advocates who have to take the case as they find it. The case was well argued, very well argued, and ably briefed, if lengthily, by the State. It will be taken under advisement. Counsels, we thank you both.